**APPEAL NO. 25-13795**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

---

**KEVIN SCOLLON**
**Plaintiff-Appellant**

**vs.**

**PICKENS COUNTY, DONALD CRAIG, JOSEPH PRICE, EVAN PANKEY, MARSHALL HULSEY, JOHN DOES 1-5**
**Defendants-Appellees**

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

**No. 2:25-CV-77-RWS**

---

# APPELLANT'S OPENING BRIEF

**Amanda Evans**
**Evans and White**
**643 Atlanta Ave SE**
**Atlanta, Georgia 30312**
**Telephone: (404) 334-5300**
**Fax: (404) 692-7954**
**Email: amanda@evansandwhite.com**

**NO. 25-13795**

**KEVIN SCOLLON V. PICKENS COUNTY, ET AL.**

**CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Pursuant to Rule 26.1-1 of the Rules of the United States Court of Appeals for the Eleventh Circuit, the undersigned counsel for Plaintiff certifies that, to the best of their present information, knowledge and belief, the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case and appeal, including subsidiaries, conglomerates, affiliates, and parent corporations, including any publicly held company that owns 10% or more of the party's stock, and other indefinable legal entities related to a party:

1. Craig, Donald, Defendant in his official capacity as Office of the Sheriff;

2. Does John 1-5, Defendants;

3. Evans, Amanda, Counsel for Plaintiff;

4. Friduss, Phillip, Counsel for Defendants Pickens County, Donald Craig, Joseph Price, Evan Pankey and Marshall Hulsey;

5. Hulsey, Marshall, Defendant individually and in his official capacity as Deputy of the Pickens County Sheriff's Office;

6. James C. Patton, P.C., associated attorney;

7. O'Neal, Jacob, Counsel for Defendants Pickens County, Donald Craig, Joseph

Price, Evan Pankey and Marshall Hulsey;

8. Pankey, Evan, Defendant individually and in his official capacity as Deputy of the Pickens County Sheriff's Office;

9. Pickens County, Defendant, a Political subdivision of the State of Georgia;

10. Price, Joseph, Defendant individually and in his official capacity as Deputy of the Pickens County Sheriff's Office;

11. Scollon, Kevin, Plaintiff;

12. Story, Honorable Judge Richard, U.S. District Court Judge.

Pursuant to 11th Cir. R. 26.1-1, Appellant certifies that no publicly traded company or corporation has an interest in the outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. This appeal presents recurring issues about (1) qualified immunity at the pleadings stage for taser deployments on a non-violent motorist seated in a vehicle, (2) official immunity at the pleading stage for claims of actual malice after deploying tasers once a subject is subdued, (3) Monell questions about a Georgia sheriff's policymaking role in roadside law-enforcement activities and lack of training, (4) Georgia sovereign/official immunity and the statutory motor-vehicle waiver, and (5) whether dismissal with prejudice is proper without first allowing repleader where the court criticizes the complaint as a "shotgun pleading." Resolution will aid district courts and law-enforcement litigants across the Circuit.

# TABLE OF CONTENTS


Certificate of Interested Persons and Corporate Disclosure……………………..ii

Statement Regarding Oral Argument………………………………………....iv

Table of Contents……………………………………………………………v

Table of Citations…………………………………………………………vii

Jurisdictional Statement……………………………………………….....4

Statement of Issues…………………………………………………….5

Statement of the Case……………………………………………………....8

Prior Proceedings & Proceedings Below………………………………8

Statement of Facts………………………………………………………9

Statement of the Standard of Review………………………………14

Summary of the Argument……………………………………………..15

Argument……………………………………………………………………19

I. The Complaint and Body-Camera Footage, Viewed in Scollon's Favor, Plausibly Allege an Unconstitutional Use of Force…….19

A. Price, Pankey, and Hulsey are not entitled to qualified immunity………………………………………………20

B. Because the Force Used Was Clearly Excessive, the Complaint States a Failure-to-Intervene Claim Against Hulsey…….34

II. The Complaint and Body-Camera Footage Plausibly Allege Deliberate Indifference to a Serious Medical Need…………….35

III. The Complaint Adequately Pleads Actual Malice Sufficient to Overcome Official Immunity Under Georgia Law……………..38

A. The District Court treated the body-cam video as dispositive, even though it does not "blatantly contradict" Scollon's allegations……………………………………………..39

B. The District Court Applied an Incorrect, Extra-Stringent Standard and Improperly Resolved Factual Disputes Against Scollon……………………………………………………41

IV. The Monell Claims Against Pickens County and Sheriff Craig Were Improperly Dismissed………………………………………………..42

A. Under *Manders*, the Sheriff Acts as a County Policymaker for the Law Enforcement Functions at Issue Here……………...43

B. *Vineyard* confirms County Monell Liability Where the Sheriff's Training and Discipline are the Moving Force Behind Excessive Force……………………………………………..45

C. Official-Capacity Claims Against the Sheriff Do Not Erase the County's Monell Exposure…………………………………46

D. Even if the Sheriff is Deemed a State Actor for Some Functions, Pickens County Remains Liable for Its Own Policies; *Grech* Is Read Too Broadly………………………..47

E. Sheriff Craig Can be Liable for Issuing a Direct Order…….50

V. The District Court Erred in Resolving Georgia's Motor-Vehicle Waiving at the Pleading Stage…………………………………..50

VI. The District Court Abused Its Discretion by Dismissing with Prejudice……………………………………………………………..52

Conclusion……………………………………………………………………54

Certificate of Compliance……………………………………………………..57

Certificate of Service…………………………………………………………58

## TABLE OF CITATIONS

**Cases**

*Adams v. Hazelwood*, 271 Ga. 414 (1999) ……………………………………..….39

*Barnes v. Felix*, 605 U.S. 73 (2025) …………………………………....21, 22, 24

*Bozeman v. Orum*, 422 F.3d 1265 (11th Cir. 2005) …………………………….16

*Chesser v. Sparks*, 248 F.3d 1117 (11th Cir. 2001) …………………………..…14

*Coffman v. Battle*, 786 F. App'x 926 (11th Cir. 2019) (per curiam)…… 28, 32, 29

*Draper v. Reynolds*, 369 F.3d 1270 (11th Cir. 2004) …………………...25, 27, 28

*Fils v. City of Aventura*, 647 F.3d 1272 (11th Cir. 2011) ……25, 26, 28, 29, 30, 33

*Goebert v. Lee Cnty.,* 510 F.3d 1312 (11th Cir. 2007)………………………….. 35

*Graham v. Connor*, 490 U.S. 386 (1989) ……………………………15, 21, 22, 23

*Grech v. Clayton Cnty.*, 335 F.3d 1326 (11th Cir. 2003)……….………. 47, 48, 49

*Johnson v. City of Atlanta*, 107 F.4th 1292 (11th Cir. 2024) ……………14, 19, 22

*Jones v. Walsh*, 272 Ga. App. 169 (2005) ………………………………14, 19, 22

*Kidd v. Coates*, 271 Ga. 33 (1999)…………………………………………….39

*Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc)…….. 43, 44, 47, 48, 49

*McBrayer v. Scarbrough*, 317 Ga. 387 (2023) ………………………………50, 51

*McDowell v. Brown*, 392 F.3d 1283 (11th Cir. 2004)……… …………………...14

*Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009) ……………15, 26, 28, 29, 31, 32

*Priester v. City of Riviera Beach*, 208 F.3d 919 (11th Cir. 2000) …………...30, 34

*Stephens v. DeGiovanni*, 852 F.3d 1298 (11th Cir. 2017) ………………25, 26, 28

*Vineyard v. County of Murray, Georgia*, 990 F.2d 1207 (11th Cir. 1993)
…………………………………………………………………44, 45, 46, 47, 49

*Vinyard v. Wilson*, 311 F.3d 1340 (11th Cir. 2002) …………...…20, 24, 29, 30, 33

*Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313 (11th Cir. 2015) …52

*Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008) ………………...25, 27, 28

**Statutes**

42 U.S.C. § 1983 ……………………………………………………..4, 8, 19

28 U.S.C. § 1291 ………………………………………………………………4

O.C.G.A. § 33-24-51(b) …………………………………………………….. 50

O.C.G.A. § 36-92-2 ………………………………………………………...50

Ga. Const. art. I, § II, para. IX(d)

U.S. Const. amend. IV

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) ……………………………………………………51

Fed. R. App. P. 28

11th Cir. R. 28-1

11th Cir. R. 28-5

## INTRODUCTION

On a quiet afternoon in Pickens County, Kevin Scollon did exactly what citizens are told to do when they feel unsafe: he called 911. Kevin Scollon felt harassed by the Pickens County Sheriff's Department. He in fact scheduled meetings with Sheriff Craig to discuss these issues, but the Sheriff cancelled these meetings. When Pickens County Deputy Price pulled him over and immediately tried to open his door, he was concerned for his safety. He called 911 and told them of his intentions, calmly drove a short distance at a normal speed to a nearby Georgia State Patrol post, and waited in his truck for officers to arrive.

Pickens County escalated this encounter, involving multiple agencies. Multiple patrol cars boxed Mr. Scollon in at the Georgia State Patrol and multiple officers surrounded the car pointing weapons at him, yelling at him to both open the door and not "fucking move." Within minutes of deputies pulling in behind Mr. Scollon, that cautious decision turned into shattered glass, multiple taser deployments, a bleeding head wound, and a trip to jail instead of a hospital.

The body-camera video and the complaint tell the same basic story. Mr. Scollon is seated, unarmed, boxed in by multiple marked units at a police facility. Deputies give him seconds to comply, then smash out his window and fire a taser

into the passenger compartment. When he reacts with words instead of violence—"fuck you"—they hit him with a second taser cycle, drag him out, and leave him bleeding and disoriented. An EMS responder removes the probes and offers a cursory evaluation. Despite obvious blood and head trauma, the deputies load him into a patrol car and drive him to the jail rather than to a hospital. The jail promptly refuses to accept him because of his condition. Mr. Scollon has ongoing hip and spinal injuries.

On these facts, long-standing precedent would treat this as a straightforward excessive-force and deliberate-indifference case. This Court has repeatedly held that significant, painful force used against a person who is contained, outnumbered, and not actively resisting is "gratuitous" and unconstitutional—and that officers may not consciously disregard an arrestee's obvious need for prompt medical care. Yet the district court dismissed every claim at the pleadings stage, granting qualified and official immunity across the board, based not on accepting the allegations as true, but on its own reading of the video and inferences drawn against the non-movant.

The question on appeal is not whether the deputies' conduct was ultimately justified on a fully developed record. It is whether Mr. Scollon is entitled to proceed past Rule 12(b)(6) on plausible allegations that deputies used gratuitous

force on a boxed-in motorist and then ignored his need for immediate medical evaluation. Under this Court's precedent, the answer is yes. The judgment should be reversed and the case remanded so that a jury—not a motion to dismiss—can decide what happened and whether that conduct was excessive.

## JURISDICTIONAL STATEMENT

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 over Appellant's § 1983 claims and supplemental jurisdiction over related state-law claims. Final judgment was entered on September 24, 2025**,** dismissing the complaint and directing the clerk to close the case. Appellant timely noticed appeal. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. **Excessive Force / Qualified Immunity.**

   Whether the district court erred in granting qualified immunity to Deputies Price, Pankey, and Hulsey and dismissing the Fourth Amendment excessive-force and failure-to-intervene claims at the Rule 12(b)(6) stage by resolving factual disputes from body-camera footage and holding, as a matter of law, that repeatedly tasing and violently extracting an unarmed, contained motorist from a boxed-in vehicle was objectively reasonable and did not violate clearly established law.

2. **Failure to Provide Medical Care.**

   Whether the district court erred in dismissing Appellant's deliberate-indifference claim and granting qualified immunity where the complaint and video plausibly allege that, after inflicting head trauma and multiple taser exposures on an older arrestee taking blood-thinning medication, deputies chose to transport him by patrol car to the jail instead of directly to a hospital, and the jail then refused to accept him without hospital treatment.

3. **Official Immunity / Actual Malice.**

   Whether the district court improperly dismissed the Georgia battery and related state-law claims on official-immunity grounds by demanding proof,

rather than plausible allegations, and by failing to credit factual allegations that the deputies used gratuitous, retaliatory, and punitive force against an unarmed, non-threatening motorist—conduct from which a jury could infer actual malice or intent to injure.

4. **Monell Liability of Pickens County and Sheriff Craig.**

   Whether the district court erred in dismissing the Monell claims against Pickens County and Sheriff Craig by treating the Sheriff as categorically a state actor and concluding, contrary to Manders and Vineyard, that no county-level policies, customs, or failures to train and supervise could be the moving force behind the excessive force and denial of medical care alleged.

5. **Georgia's Motor-Vehicle Waiver of Sovereign Immunity.**

   Whether the district court prematurely held, at the pleading stage, that Pickens County had not waived sovereign immunity under O.C.G.A. §§ 33-24-51(b) and 36-92-2, despite allegations that deputies used a covered patrol vehicle to box in Appellant's truck and then to transport him to the jail rather than to a hospital, in tension with the Georgia Supreme Court's broad construction of "use" in McBrayer v. Scarbrough.

6. **Dismissal With Prejudice and "Shotgun Pleading."**

   Whether the district court abused its discretion by dismissing the complaint

with prejudice—while criticizing it as a "shotgun pleading"—without first striking it or granting Appellant the one opportunity to replead that this Court's precedents require before entering a non-merits dismissal on shotgun-pleading grounds.

## STATEMENT OF THE CASE

### Prior Proceedings and Proceedings Below

Appellant filed this action in the State Court of Pickens County on March 27, 2024, asserting federal claims under 42 U.S.C. § 1983 for excessive force, unlawful seizure, failure to intervene, and deliberate indifference to serious medical needs, as well as related state-law claims including battery and negligence. Doc. 1-1 at ¶¶40–88.

Defendants removed the case to the United States District Court for the Northern District of Georgia on April 17, 2024. Doc. 1. After removal, the County Defendants filed a motion to dismiss, and subsequently an amended motion to dismiss, arguing that the deputies were entitled to qualified immunity on all federal claims, that the Sheriff and County were immune under the Eleventh Amendment and Georgia sovereign immunity, and that the state-law claims failed based on official immunity. Doc. 3; Doc. 14.

Appellant filed a response in opposition, citing video footage submitted by Defendants. Doc. 18; Doc. 17-A–17-F. The district court considered the Complaint and the body-camera footage in ruling on the motion. Doc. 20. On August 21, 2025, the district court entered a 54-page order granting the amended motion to dismiss in full and dismissing all claims with prejudice. Doc. 20 at 54.

The district court concluded that Deputies Price and Pankey were entitled to qualified immunity on the Fourth Amendment excessive-force claim, that Deputy Hulsey could not be liable for failure to intervene, and that all defendants were entitled to dismissal of the deliberate-indifference claim. Doc. 20 at 21–43. The court also held that Appellant failed to plead actual malice sufficient to overcome official immunity for his state-law claims. Doc. 20 at 20–24. Finally, the court dismissed the claims against the County and Sheriff on sovereign-immunity and Monell grounds. Doc. 20 at 10–20. Judgment was entered the same day. Doc. 20 at 54. Appellant timely filed a notice of appeal. Doc. 22.

## Statement of Facts

On February 26, 2023, Plaintiff–Appellant Kevin Scollon (hereinafter referred to as "Appellant" or "Scollon") was driving from his workplace toward a local park when he was stopped by Deputy Joseph Price of the Pickens County Sheriff's Office. Doc. 1-1 at ¶21; Doc. 20 at 2. Appellant alleges that he was afraid of Pickens County deputies due to prior negative encounters. Doc. 1-1 at ¶22; Doc. 20 at 2. Deputy Price approached Appellant's vehicle and immediately tried to open the door. Doc. 17-A at 1:52. (Doc 17-A refers to the body camera footage provided by Appellees and labeled as Exhibit A, and 1:52 refers to the time on the recording). When Deputy Price approached the driver's side window, Appellant

did not roll it down but placed a call to 911, stating that he wished to drive to the nearby Georgia State Patrol ("GSP") post—approximately two miles away—because he felt safer interacting with State Patrol officers. Doc. 1-1 at ¶23; Doc. 20 at 2–3.

The 911 operator informed Deputy Price that Appellant had called and was driving to the GSP post. Doc. 20 at 3; Doc. 17-A at 2:40–2:45. During the brief drive, Deputy Price acknowledged to dispatch that Appellant was traveling at a safe speed. Doc. 20 at 3; Doc. 17-A at 5:54. The dispatcher advised Defendant Price Appellant was instructed to go to the State Patrol office due to possible harassment. Doc. 17-A at 3:25. The dispatcher confirmed there was a state pick up only warrant for Appellant in Michigan, meaning they would not extradite from Georgia. Doc. 17-A at 3:49. The dispatcher tells Deputy Price she told Scollon to stay in the car when he gets to the post. Doc. 17-A at 5:34.

Additional deputies from the Sheriff's Office and the Jasper Police Department responded to the scene and traveled toward the GSP post. Doc. 20 at 3; Doc. 1-1 at ¶24. Upon arriving at the GSP post, Appellant parked his truck directly in front of the building. Doc. 20 at 3. Multiple law-enforcement vehicles positioned themselves around the truck, blocking the exit. Doc. 20 at 3–4; Doc. 17-A at 11:20–11:50. Appellant remained inside his vehicle. Doc. 20 at 4. Plaintiff was

clearly frightened of the number of officers and his prior interactions, and simply wanted to wait for the State Police to arrive. He told the deputies he was waiting for the State Police. The deputies replied, you are going to pay for that. The deputies broke Plaintiff's driver and passenger side windows. (*Id*. at ¶25).

Deputy Price's body cam shows the scene. Deputy Price approaches Plaintiff's vehicle and tries to open the door before asking Plaintiff to get out of the car. Plaintiff is on the phone. Doc. 17-A at 11:33. Defendant Price decides he has tried enough and goes to the passenger window with his baton to break the window. Doc. 17-A at 11:51. Defendant Price breaks Plaintiff's window. Defendant Pankey immediately points his taser and starts telling Plaintiff, "don't fucking move." Doc. 17-A at 12:08. Defendant Price says he is going to drag Plaintiff out. Deputy Pankey tells Scollon "I'm going to light you up." Doc. 17-A at 12:08. They are yelling at Appellant to open the door. Doc. 17-A at 12:23.

At this time numerous deputies are standing around the vehicle and can see he is not armed. Doc. 17-A at 12:32. When Appellant reaches toward the door, Deputies Price and Pankey tase Appellant. Doc. 17-A at 12:35. All of this happens within 62 seconds. The probes struck Appellant, who remained seated in the driver's seat. Doc. 20 at 6; Doc. 17-A at 12:32–12:37. After the initial tasing, Appellant is sitting upright and says "fuck you." His hands are in full view and he

is not holding any weapons. Deputies Price and Pankey immediately tase him again. Doc. 17-A at 12:50. Another deputy arrives and says "hold taser," yet Pankey and Price continue to tase Scollon for another ten seconds. Doc. 17-C at 1:19. There is conversation between Hulsey and this deputy that is unintelligible from the video. Doc. 17-C at 1:19.

Following the second taser deployment, Deputy Hulsey broke the driver's side window, opened the door, and pulled Appellant from the truck. Doc. 20 at 7; Doc. 17-C at 1:09–1:28. He was taken to the ground and handcuffed. Doc. 20 at 7–8; Doc. 17-C at 1:28–2:10. The video shows that Appellant had a bleeding head wound while on the ground. Doc. 20 at 7–8; Doc. 17-A at 13:48–13:50. When he went to stand up, he was woozy. Doc. 17-A at 13:52. Appellant says he is dizzy when he stands. Doc. 17-A at 23:55. He was never told he was under arrest until after he is pulled unto the ground.

Appellant was not armed. He was not resisting arrest. He was not dangerous. Doc. 1-1 at ¶¶33-35. The behavior of the Deputies shows Appellant was justified in being afraid of the Pickens County Sheriff's Office. Prior to this incident, Plaintiff had an appointment scheduled with Sheriff Craig to discuss Pickens County deputies harassing him. The Sheriff cancelled the appointment twice. Doc. 1-1 at ¶22b. At the scene, the Deputies state, that's two days in a row

regarding the incident. One of them replies, the one from yesterday was way worse. This was an easy one. Doc. 17-A at 24:26). The Appellees waived immunity to the extent these violations were carried out through the negligent use of a covered vehicle and liability insurance was purchased pursuant to O.C.G.A. Sect. 36-92-2. Doc. 1-1 at ¶88.

Pickens County Fire and Rescue personnel arrived shortly thereafter and removed the taser probes. Doc. 20 at 8; Doc. 17-C at 9:50–12:01. Appellant advised responders that he was taking blood-thinning medication. Doc. 20 at 8. The medic assessed Appellant, noting elevated blood pressure and a “bump on his head.” Doc. 20 at 8–9; Doc. 17-B at 21:48–22:04. When asked whether Appellant was “good for the jail,” the medic responded that he was. Doc. 20 at 9; Doc. 17-B at 21:56.

Deputy Price transported Appellant to the Pickens County jail in a patrol vehicle. Doc. 20 at 9; Doc. 17-A at 33:02–39:18. Upon arrival, however, the jail nurse declined to accept Appellant until he received medical treatment at a hospital. Doc. 1-1 at ¶70; Doc. 20 at 9. Appellant has ongoing spinal and hip injuries. Doc. 1-1 at ¶26.

Appellant subsequently filed this action in state court. Defendants removed the case to federal court and moved to dismiss. Doc. 20 at 9–12. Appellant

incorporated both the complaint allegations and the body-camera footage in responding to the amended motion to dismiss. Doc. 18 at 2–6; Doc. 20 at 12–13. The district court granted the motion and dismissed all claims. Doc. 20 at 54.

## Standard of Review

A Rule 12(b)(6) dismissal is reviewed de novo, with the Court accepting the complaint's well-pleaded factual allegations as true and construing all reasonable inferences in the plaintiff's favor. *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024). Qualified-immunity determinations made at the pleading stage are also reviewed de novo. *Chesser v. Sparks*, 248 F.3d 1117, 1121 (11th Cir. 2001). The district court's dismissal of the state-law claims based on sovereign or official immunity is likewise subject to de novo review. *McDowell v. Brown*, 392 F.3d 1283, 1292 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

This appeal arises from a Rule 12(b)(6) dismissal that resolved factual disputes and immunities on a paper record, using body-camera video to credit the officers' version of events rather than accepting the complaint's allegations and drawing reasonable inferences for Appellant. Even on the district court's own description of the video, the claims should not have been dismissed.

First, the excessive-force and failure-to-intervene claims plausibly allege a Fourth Amendment violation. The complaint and video, viewed in the light most favorable to Appellant, describe a non-violent traffic stop that escalated within minutes into a multi-car boxing-in maneuver, window-smashing, and multiple taser deployments on a seated, unarmed, outnumbered motorist who had already driven to a police facility and stayed in his car at 911's direction. On those facts, significant force used to punish rather than to subdue a genuine threat fits squarely within this Court's "gratuitous force" line and defeats qualified immunity at the pleading stage. The district court reached the opposite result only by drawing inferences from the video against the non-movant and treating minor gestures and profanity as decisive findings of "active resistance."

Second, the deliberate-indifference claim was also plausibly alleged and should not have been dismissed on qualified-immunity grounds. After twice tasing Mr. Scollon, breaking his window, and causing a bleeding head injury and visible distress, deputies chose to transport him by patrol car to the jail rather than to a hospital; the jail then refused intake because of his condition and he was sent for belated treatment. Those allegations support a reasonable inference that the deputies knowingly disregarded an objectively serious medical need. Under this Court's precedents, officers may not consciously ignore obvious signs of serious medical distress or intentionally delay necessary care, and qualified immunity does not shield deliberate indifference of that kind at Rule 12.

Third, the dismissal of the Georgia tort claims on official-immunity grounds likewise rested on premature fact-finding and too narrow a view of "actual malice." The complaint alleges that force was used not to neutralize a continuing threat, but to punish and retaliate—a second taser cycle after the window was broken and while Mr. Scollon remained contained, followed by transport to jail despite obvious injury. From those allegations, a jury could reasonably infer the actual malice or intent to injure required to overcome official immunity; demanding proof of subjective intent and resolving that issue for the deputies on the pleadings was error.

Fourth, Appellant adequately pled a Monell claim against Pickens County and Sheriff Craig. Rather than conducting the function-by-function analysis required by this Court's precedents, the district court effectively treated the Sheriff as a state actor for all purposes and concluded no county policy could be implicated. But the complaint alleges that county-level policies and customs governing taser use, vehicle boxing, 911 coordination, complaint handling, and decisions about medical transport were the moving force behind what happened. Whether, for these specific law-enforcement functions, the Sheriff was "wearing a county hat" and acting as the County's final policymaker is not a question that can be resolved against Appellant on a motion to dismiss.

Fifth, the court prematurely foreclosed Georgia's motor-vehicle waiver of sovereign immunity. After the Georgia Supreme Court's recent guidance, "use" of a covered vehicle is not confined to collisions or driving; it includes how patrol cars are put into service, including transport decisions affecting an arrestee's safety and medical care. The complaint alleges that deputies used a patrol car to transport an obviously injured arrestee to jail instead of to a hospital, delaying and worsening his injuries. Whether that constitutes negligent "use" under the motor-vehicle waiver is, at a minimum, a fact-bound question that should not have been

resolved as a matter of law at the pleading stage, and any perceived lack of clarity could have been addressed by targeted amendment.

Finally, even if any aspect of the complaint were deemed an imperfect or "shotgun" pleading, this Court's decisions make clear that the proper remedy is to require repleader, not to terminate the case with prejudice at the first pass. By criticizing the pleading form yet immediately closing the case, the district court abused its discretion and denied him the one opportunity to cure technical pleading defects that Eleventh Circuit law guarantees. The judgment should be reversed and the case remanded, at a minimum, for further proceedings on the federal excessive-force, failure-to-intervene, and medical-care claims, the related municipal and immunity issues, and any state-law claims the Court concludes were prematurely dismissed.

## Argument

This appeal challenges the dismissal of Appellant's civil-rights claims under 42 U.S.C. § 1983 for excessive force, failure to intervene, and deliberate indifference, as well as related state-law claims. Because the deputies submitted body-camera footage with their amended Rule 12 motion and the district court expressly relied on it, Appellant may cite to the same footage under the incorporation-by-reference doctrine. See *Johnson v. City of Atlanta*, 107 F.4th 1292, 1299–1301 (11th Cir. 2024). This footage is cited as Doc. 17 with the corresponding Exhibit letter and time stamp on the video.

### I. THE COMPLAINT AND BODY-CAMERA FOOTAGE, VIEWED IN SCOLLON'S FAVOR, PLAUSIBLY ALLEGE AN UNCONSTITUTIONAL USE OF FORCE.

The district court erroneously held that the Appellee Pickens County Deputies Price Pankey, and Hulsey (hereinafter referred to as "Price," "Pankey," and "Hulsey" or collectively as the "Deputies") were entitled to qualified immunity in their individual capacity for their repeated deployment of tasers, shattering of Appellant's (hereinafter referred to as "Scollon") truck windows, and yanking him out of the truck unto the ground. The Court concluded this use of force against an unarmed man was reasonable as a matter of law and did not violate clearly

established Fourth Amendment rights. The court then concluded that since Price and Pankey did not violate Scollon's rights, then Hulsey did not fail to intervene. That conclusion is inconsistent with Supreme Court precedent and multiple Eleventh Circuit decisions.

**A. Price, Pankey, and Hulsey are not entitled to qualified immunity.**

"Under the doctrine of qualified immunity, government officials acting within their discretionary authority are immune from suit unless the official's conduct violates clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010) (internal quotation marks and brackets omitted); *Tapley v. Collins*, 211 F.3d 1210, 1214 (11th Cir. 2000). Plaintiffs can overcome the qualified immunity defense by showing that (1) a defendant's conduct violated a constitutional right and (2) this right was "clearly established at the time of the alleged violation." *Townsend v. Jefferson Cnty.*, 601 F.3d 1152, 1158 (11th Cir. 2010). The Fourth Amendment freedom from unreasonable searches and seizures is a clearly established right, and "encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002).

**1. Price, Pankey, and Hulsey's conduct violated Scollon's constitutional right to be free from unreasonable searches and seizures.**

Scollon brought claims for excessive force against Price, Pankey, and Hulsey. Claims of excessive force during a seizure are governed by the Fourth Amendment's "objective reasonableness" standard. *Graham v. Connor*, 490 U.S. 386, 395 (1989). The analysis requires careful attention to "the facts and circumstances of each particular case," including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to flee. *Id*. at 396.

Recently, the Supreme Court reaffirmed that courts must consider "all the relevant circumstances" of the encounter, and rejected any rule that artificially narrows the inquiry to a split-second "moment of threat." *Barnes v. Felix*, 605 U.S. 73, 76 (2025). In deciding whether force is reasonable, courts must account for the nature of the underlying offense, the officer's prior opportunities to de-escalate, any warnings given, and the suspect's conduct throughout the interaction. *Id.* "Prior events may show why a reasonable officer would perceive otherwise ambiguous conduct as threatening, or instead as innocuous." *Barnes*, 605 U.S. at

80.[1] In *Barnes*, an officer was granted immunity for shooting an individual because he felt threatened in the two seconds leading up to the shooting. The Supreme Court rejected only looking at the seconds leading up to the use of force, again emphasizing the totality of the situation. *Id.* The Court must ask, does the force and the bodily harm it could cause to an individual outweigh the threat the officer is trying to eliminate. *Johnson v. City of Atlanta,* 107 F. 4th 1292, 1302 (11th Cir. 2024). If the force outweighs the threat, like here, immunity is overcome. The totality of the circumstances prevails.

a. The Force applied to Scollon greatly outweighs the threat.

Applying *Graham* and *Barnes*—and taking the facts in the light most favorable to Scollon—the Deputies used significant force in their encounter with Scollon. The Deputies were aware Scollon felt harassed by the Pickens County Sheriff and he was driving to the Georgia State Patrol. They launched a multi-car, multi-agency pursuit. They boxed in Scollon at the Georgia State Patrol. Price immediately tried to open Scollon's door. The Deputies positioned multiple

[1] Plaintiff concedes Defendants were acting in their discretionary authority and therefore focus on the proportionality of the force.

deputies around him, pointing weapons at him, all while he tells them he is waiting for the Georgia State Patrol. Within seconds of trying the door, Price breaks Scollon's window. The only words spoken to Scollon during this approximately 62 second encounter are "don't fucking move," "open the door," and "I'm going to light you up." Scollon is being told to not move, but open the door at the same time. Then the tasers come. Scollon is sitting upright with his hands fully visible, and two more tasers come. He is clearly incapacitated, his body seizing, and Hulsey rips him out of the car by his arm and hit his head on the ground. This force is clearly excessive to a reasonable officer.

Under *Graham*, Appellant was initially stopped for at most a traffic violation. The officers were aware there is a state pick up only warrant for Scollon in Michigan, which means nothing would happen in Pickens County, Georgia. Scollon did not pose a threat to anyone. He was unarmed. He called 911 to tell them he was driving to the Georgia State Patrol. He drove slowly and obeyed all traffic laws while driving there. He was told to stay in the car when he arrived at Georgia State Patrol, this was confirmed on the radio by Price. The Deputies can clearly see into Scollon's truck and see that there are no weapons. He is trying to call 911, which the Deputies knew, and drops his phone. There is only one Scollon, but he is surrounded by multiple deputies and officers. Finally, Scollon is

not attempting to flee or resist arrest. His car is parked, exactly where he said he would park. At no point prior to tasing was Scollon was he told he was under arrest such that he could resist it. The only "resistance" the court identified was Scollon's failure to open his door or window and his verbal expletives in response to being tased and having his windows shattered. But profanity and verbal frustration, especially after painful force, cannot justify escalation. See *Vinyard v. Wilson*, 311 F.3d 1340, 1348 (11th Cir. 2002) (holding that verbal noncompliance and profanity do not create a threat justifying force).

Even if this Court believes the Deputies felt threatened to justify the first two tasers, the additional use of force was excessive. Scollon was sitting upright, not reaching for anything, when the second rounds of tasers were deployed. Hulsey then ripped Scollon from the truck by his arm when he was clearly incapacitated due to the four tasers. Another deputy is telling Price and Pankey to "hold taser," but they continue to taser him for another 10 seconds, causing pain and injury to Scollon.

Under *Barnes*, the totality of the circumstances clearly supports Scollon's excessive use of force claims. The body cam footage, taken in the light favorable to Scollon, show a rather peaceful encounter. Price pulls Scollon over, then when Scollon drives away, he is informed Scollon immediately called 911. The drive

was uneventful, Scollon following traffic laws and posted speed limits. Scollon went exactly where he said he would and waited in the car, like he was instructed. The body cam footage from the deputies nearby show the scene was not chaotic. Price arrived at the scene and tased Scollon within sixty-two seconds after approaching the truck, Pankey tased Scollon as well. Given the circumstances leading up to Scollon being tased, there was no reason to think he was a threat. The Deputies simply could have waited for Georgia State Patrol. At the Rule 12 stage, that is enough to allege a constitutional violation.

b. Eleventh Circuit Precedent Clearly Established that Repeated Taser Use Against a Non-Violent, Contained Suspect Is Excessive.

The district court focused on decisions like *Draper v. Reynolds* and *Zivojinovich v. Barner*, which upheld single Taser deployments against belligerent, aggressively uncooperative suspects in "difficult, tense, and uncertain" roadside encounters. See *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004); *Zivojinovich v. Barner*, 525 F.3d 1059, 1072–73 (11th Cir. 2008). Those cases do not control here and, in fact, highlight why the force used against Appellant was clearly excessive.

c. This case is closer to *Oliver*, *Fils*, and *Stephens* than to *Draper* and *Zivojinovich*.

In *Oliver v. Fiorino*, officers repeatedly tased an unarmed, non-threatening man eight to twelve times over roughly two minutes, causing his death. The Eleventh Circuit held that this repeated taser use "was so plainly unnecessary and disproportionate that no reasonable officer could have believed it was lawful," and denied qualified immunity. *Oliver v. Fiorino,* 586 F.3d 898, 903–04 (11th Cir. 2009).

Similarly, in *Fils v. City of Aventura*, the court held it was clearly established by 2002 that using a taser on a non-violent suspect who was not resisting arrest was excessive force. *Fils v. City of Aventura*, 647 F.3d 1272, 1288–89 (11th Cir. 2011). In *Fils*, the plaintiff did not make any menacing gestures toward the officers and did not pose a threat to the safety of anyone. As *Fils* explained, "resisting arrest without force does not connote a level of dangerousness that would justify a greater use of force." *Id.* at 1288.

And in *Stephens v. DeGiovanni*, the court vacated summary judgment on qualified-immunity grounds where a deputy repeatedly slammed a compliant misdemeanor suspect against a car doorframe, emphasizing that "no reasonable police officer could believe that" such gratuitous force was permissible. *Stephens v. DeGiovanni*, 852 F.3d 1298, 1318–19 (11th Cir. 2017).

Those cases share critical features with this one:

• the underlying crimes were minor;

• the plaintiffs were unarmed;

• their "resistance" was, at most, verbal non-compliance or passive refusal; and

• officers escalated to significant force—repeated tasers or violent slamming—without an imminent physical threat.

By contrast, *Draper* involved a lone officer at night dealing with a single, highly agitated motorist who repeatedly advanced on the officer, yelled, and refused to comply with simple commands during a highway stop. The Eleventh Circuit stressed that the single taser use there was a "reasonably proportionate" response to a rapidly deteriorating roadside situation. *Draper*, 369 F.3d at 1278. Likewise, *Zivojinovich* relied on the suspect's belligerent behavior and repeated ignoring of instructions in a chaotic hotel-party confrontation. *Zivojinovich*, 525 F.3d at 1072–73.

Here, accepting Scollon's allegations and the video in his favor, the encounter at the State Patrol office took place in a parking lot during the day, multiple officers were present, Appellant remained inside his parked truck, he never attempted to run down an officer or flee the scene once parked, and the only "aggression" the court identified was his refusal to open the door and his profane language. Driving to a safe, public, well-lit police station is not resistance. Scollon

called 911 and told them of his intentions, then followed through. The dispatcher told him to stay in the car. That conduct is far closer to the non-violent, low-level resistance in *Oliver*, *Fils*, and *Stephens* than to the aggressive confrontations in *Draper* and *Zivojinovich*.

The judge assumed Price and Pankey felt there was a threat in Scollon reaching for the door, but that is an incorrect inference at the Motion to Dismiss stage. The Deputies were asking Scollon to open the door. Viewed in Scollon's favor, he could be reaching for the door because he was being yelled at to open the door. It is error for the district court to assess motive from the video for purposes of a Motion to Dismiss. Further, two more tasers were deployed into Scollon because he told the officers "fuck you" after being tased the first time. He pulled the probes from his body. His hands were clearly visible. He was unarmed. Then, after another round of tasers, he was incapacitated while Hulsey pulls him from the car. Viewing these incidents as three separate uses of force, even if this Court believe the first round of tasers were not excessive, the second round clearly were: there was no threat.

**2. Price, Pankey, and Hulsey violated Scollon's clearly established Fourth Amendment rights.**

To determine whether a right is clearly established for purposes of qualified immunity is to ask whether it would be sufficiently clear that a reasonable officer would understand that what he is doing violates that right. *Oliver*, 586 F.3d at 907; *Wilson v. Layne*, 526 U.S. 603 (1999). The "critical question is whether the law gave the officer 'fair warning' that his conduct was unconstitutional." *Coffman v. Battle,* 786 F. App'x. 926, 932 (11th Cir. 2019)(per curiam). The Eleventh Circuit uses two methods to determine if a right is clearly established. First, the Court can look to relevant case law to determine the right is clearly established. This method does not require the case law be "materially similar to the officer's conduct; officials can still be on notice that their conduct violates established law even in novel factual circumstances. *Fils,* 647 F.3d at 1291. The second method inquires whether the conduct "lies so obviously at the core very of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case law. *Fils,* 647 F.3d at 1291, *quoting, Vinyard,* 311 F.3d at 1355. Here, there is both settled case law and fair warning to the officers.

By 2023, it was clearly established that officers may not repeatedly tase a contained, non-threatening suspect for verbal or passive resistance. Eleventh Circuit precedent clearly established several relevant propositions:

In *Fils*, the plaintiff was tased even though he committed at most a minor offense, he did not threaten anyone, and he did not disobey instructions, even though he called the police "motherfuckers." The Court ruled there was a clearly established right under both methods. First, the Court looked to *Priester*, where an attack dog was set on plaintiff who was lying flat on the ground. *Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000). The Court also looked to *Vinyard,* where pepper spray was used on a restrained non-violent plaintiff who used profanity toward the officers. *Vinyard,* 311 F.3d at 1347-48. Even though the facts of these cases involved a dog and pepper spray, and not a taser, the court ruled this was settled case law and provided the Defendants had fair warning they were violating a clearly established right. The *Fils* ruling, decided in 2011, then further solidified the case law in Scollon's favor: the defendants violated a clearly established right by tasering an unarmed, non-violent suspect who did not present a threat and made no menacing gestures. The Court went on to say the defendant's conduct also violated the "obvious clarity" exception to qualified immunity. The line was not "hazy" and the officers' actions were clearly wrong. *Fils,* 647 F.3d at 1292.

Here, Price and Pankey tased a man who was fully contained sitting in his truck. There were multiple deputies, including Deputies, standing over Scollon's

truck and the evidence should be construed to show they knew he did not have a weapon. The evidence in Scollon's favor also shows he was unarmed. There was no chance for Scollon to resist arrest, the entire encounter from Price trying to get into his car to tasering him was 62 seconds. He could not disobey instructions; he was being yelled at to not move and yet open the door at the same time. The Deputies would have this Court decide that because Scollon drove away from the initial stop, that all force became acceptable. This simply does not fit with the facts and totality of the circumstances. Scollon called 911 to tell them of his intentions, and slowly drove to the Georgia State Patrol. He waited in his car, like he was instructed by the 911 operator. He was surrounded by multiple deputies and posed no threat. He certainly posed no threat when he was sitting upright in the truck after the first taser attack, yet he was tased again. He certainly posed no threat when he was incapacitated from multiple taser shocks, yet Hulsey drug him from his truck by his arm and hit his face on the ground, causing injuries. Price, Pankey, and Hulsey violated Scollon's clearly established rights.

In *Oliver*, Oliver flagged down a police cruiser to ask for help. He attempted to open the cruiser door. Oliver attempted to walk away from the officer, then walked quickly toward her. He was very fidgety and claimed people were shooting at him. He was talking loudly and moving his hands around. The

officer grabbed Oliver's shirt and attempted to walk him across the street. Oliver pulled away, and the officer tased him the first time, then tased him again, and again. The Court found the officers were not entitled to immunity under the obvious clarity law. The force "employed was so utterly disproportionate to the level of force reasonably necessary that any reasonable officer would have recognized his actions were unlawful. The need for force was exceedingly limited." *Oliver,* 586 F.3d at 908. Oliver was not suspected of any crime, let alone a violent one, he was not belligerent or aggressive, he complied with most of the officers' directions, and he made no attempt to flee. *Id.*

Here, viewing the facts and body cam footage in the light most favorable to Scollon, he was not suspected of a violent crime (at most there was a no state pick up warrant in Michigan); he was not aggressive; and he complied with the order he was given (to stay in his car when he arrived at Georgia State Patrol). Scollon was simply sitting in his car trying to get help because he was fearful based on prior interactions of the very people who then hurt him.

Even if this Court rules there is not a clearly defined right related to the first tasering of Scollon, the officers had fair warning their conduct of the second tasing and dragging was unconstitutional: Scollon was subdued. In *Coffman,* a prisoner was tased seconds after he was restrained to a chair. The court ruled that in 2016,

it was long established that continuing to use substantial force against a person who has either become compliant, subdued, or otherwise incapacitated violated a clearly established right. *Coffman v. Battle,* 786 F. App'x. 926, 933 (11th Cir. 2019). It did not matter that the tasing happened seconds after the inmate was restrained; once the threat was over, the justification for force is over. *Coffman* dealt with an inmate, but the excessive force analysis is the same.

In light of these cases, every reasonable officer in 2023 would have understood that twice tasing an unarmed motorist, trapped in a boxed-in truck, whose "resistance" was limited to refusing to unlock his door and uttering profanity, while surrounding officers pointed firearms at him, violated clearly established Fourth Amendment limits. Further, another deputy recognized the situation was under control and stated "hold taser," yet Price and Pankey continued. The force must stop the second the perceived threat is over. Scollon has properly alleged facts to support his claims against Price and Pankey for the excessive use of force when deploying their tasers, and against Hulsey for dragging Scollon out of the window by his arm.

This case fits squarely within the Eleventh Circuit's "obvious clarity" category, where the force used is so gratuitous and disproportionate that no materially similar precedent is required to give fair warning. *Vinyard*, 311 F.3d at

1355; *Fils*, 647 F.3d at 1291. Repeatedly tasing and then violently extracting a seated, surrounded, unarmed motorist—after smashing his windows—lies at the very core of what the Fourth Amendment prohibits.

### B. Because the Force Was Clearly Excessive, the Complaint States a Failure-to-Intervene Claim Against Hulsey.

The District Court dismissed Scollon's failure-to-intervene claim against Deputy Hulsey on the ground that, because the underlying force was not clearly unconstitutional, Hulsey had no duty to intervene. That reasoning falls with the excessive-force holding.

An officer who is present and fails to intervene in another officer's use of excessive force can be liable under § 1983 if he is in a position to intervene and fails to do so. See, e.g., *Priester,* 208 F.3d at 924–27. Once it is recognized that the complaint and video plausibly allege clearly excessive force by Price and Pankey, it follows that Scollon has stated a claim that Hulsey, who was on the scene and participated in surrounding the truck, failed to intervene. In filing Scollon's Complaint, Scollon did not have the benefit of the body cam footage, which was only produced in an Amended Motion to Dismiss. The body cam footage notes Hulsey pulled Scollon from the truck, not Price and Pankey. However, Hulsey failed to intervene to stop Price and Pankey from tasering Scollon multiple times.

At a minimum, whether Hulsey had a realistic opportunity to intervene is a fact question not suitable for resolution on a motion to dismiss.

## II. THE COMPLAINT AND BODY-CAMERA FOOTAGE, VIEWED IN SCOLLON'S FAVOR, PLAUSIBLY ALLEGE A FAILURE TO PROVIDE MEDICAL ATTENTION.

The District Court dismissed Scollon's claims that Deputies were deliberately indifferent to his serious medical needs when, after inflicting head trauma and multiple taser exposures on an elderly arrestee who was on blood-thinning medication, they chose to transport him to jail rather than directly to a hospital. That ruling again applies too stringent a standard at the pleading stage and misreads this Court's precedent.

To show deliberate indifference, a pretrial detainee must allege that officials (1) had subjective knowledge of a risk of serious harm, (2) disregarded that risk by conduct more than mere negligence, and (3) caused the injury. *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1326-27 (11th Cir. 2007). A serious medical need is one diagnosed by a physician as requiring treatment, or so obvious that even a lay person would recognize the need for a doctor's attention. *Goebert*, 510 F.3d at 1326.

*Goebert* illustrates the point. There, the Court held that jail officials could be deliberately indifferent where they delayed or denied treatment in the face of a serious condition, even though medical staff had initially misjudged its severity. *Goebert*, 510 F.3d at 1328–29. In *Patel v. Lanier County Georgia,* deputies were held liable for failing to provide medical care to a detainee who was locked in the back of a hot transport vehicle. The detainee's medical condition of sweating, breathing fast, and lying down was visible to the deputies and even a layperson could identify the need for a medical doctor. *Patel v. Lanier County Georgia,* 969 F.3d 1173, 1189-1190 (11th Cir. 2020).

At the pleading stage, Scollon was not required to prove deliberate indifference; he needed only to plausibly allege that the deputies' choice to prioritize jail processing over hospital evaluation, in the face of apparent head trauma and blood-thinner use, crossed the line from negligence into deliberate disregard. He did so. The body cam footage indicates no one even asked Scollon if he needed an ambulance. Dismissal of Count V on qualified-immunity grounds was therefore error.

Here, Scollon alleged and the body cam footage showed he suffered a bleeding head wound after being forcibly removed from his truck, he advised responders he was taking blood thinners, he was just subjected to multiple taser

deployments, he was woozy and could not stand up straight, he told the Deputies he was dizzy, and the jail nurse later refused to accept him without hospital treatment. Viewed in the light most favorable to Scollon, these allegations easily satisfy the objective seriousness requirement.

Further, in regard to the second prong to overcome qualified immunity, the need for medical care and intentionally refuse to provide it has consistently been held to surpass negligence and constitute a deliberate indifference to a person's rights. Even without analogous case law, this is a clearly established principal. *Patel* 969 F.3d at 1190.

The District Court erroneously reasoned that the Deputies could rely entirely on the on-scene paramedic's statement that Scollon was "good for the jail," and that Scollon's condition was not "so obviously dire" that a lay officer had to know the medic had grossly misjudged his condition. Doc. 20 at 41–43 (citing *Townsend v. Jefferson Cnty.,* 601 F.3d 1152 (11th Cir. 2010)). But *Townsend* does not create an absolute shield whenever a medic offers a cursory opinion, especially where the officers know facts suggesting heightened risk. In *Townsend*, an inmate was experiencing a miscarriage. The only outward signs observed by any of the defendants were some spotting and the inmate's complaints. The defendants relied

on statements from the nurse that there was no emergency. This contrasts strongly to the situation in this case.

Here, viewing the allegations in Scollon's favor, the Deputies knew that Scollon had been tased multiple times and physically taken to the ground; he had a visible, bleeding head wound; he was an older man on anticoagulant medication; and the paramedic noted a "bump on his head" and elevated blood pressure. Those facts, combined with the well-known risks of intracranial bleeding in patients on blood thinners after head trauma, allow a reasonable jury to conclude that simply asking "is he good for the jail?" and transporting him there, rather than to an emergency department, reflected deliberate disregard of a substantial risk of serious harm. Visible head wound caused by a deputy strongly, coupled with the woozy appearance of Scollon contrast the complicated medical world of miscarriages and spotting. Scollon then experienced further injuries because of this delay in care.

## III. THE DISTRICT COURT ERRED IN HOLDING THAT THE COMPLAINT FAILED TO ALLEGE ACTUAL MALICE SUFFICIENT TO OVERCOME OFFICIAL IMMUNITY

Scollon's Complaint sufficiently pleads facts and claims supporting his state

law claims for battery. The district court incorrectly drew inferences in the Deputies' favor, not Scollon's, and demanded proof, not plausible allegations.

### A. The District Court treated the body-cam video as dispositive, even though it does not "blatantly contradict" Plaintiff's allegations.

An officer is not entitled to official immunity for claims of battery if the officer acted with "actual malice or an intent to injure." *Porter v. Massarelli*, 303 Ga. App. 91 (2010). If an officer shoots "intentionally and without justification, then he acted solely with the tortious actual intent to cause injury and would not be protected by official immunity." *Id.* at 96 (citing *Kidd v. Coates*, 271 Ga. 33 (199) (internal quotations omitted)). In *Porter*, on officer claimed the plaintiff was threatening him with a moving vehicle during a traffic stop and the officer shot the plaintiff. There was conflicting evidence regarding whether the vehicle was moving and the officer's feelings regarding his safety were not sufficient to claim official immunity. The Court analyzed the circumstances under the much more stringent qualifications of summary judgment, not a motion to dismiss like the one before this Court. *Id.*

The Georgia Supreme Court has made clear that actual malice exists when an officer intentionally commits an unlawful act or knowingly exceeds his authority. *Kidd*, 271 Ga. at 34–35 (actual malice where officer knowingly arrested

plaintiff without probable cause); *Adams v. Hazelwood*, 271 Ga. 414, 415 (1999) (malice exists where officer intends to commit wrongful act). Georgia courts have repeatedly held that gratuitous force, especially against a non-threatening citizen, supports an inference of actual malice. In *Coffman v. Battle*, 786 F. App'x. 926 (11th Cir. 2019), this Circuit upheld the district court's ruling that a jury question existed on actual malice where a jailor tased an inmate after he was subdued. It did not matter that the inmate was subdued seconds before, a jury could still find malice. In *Felio v. Hyatt,* the Court allowed claims of actual malice to go forward to a jury after an officer shot a plaintiff once he was subdued, laying on the floor and compliant. A jury issue existed over whether there was actual malice. *Felio v. Hyatt,* 639 F. App'x. 604 (11th Cir. 2016).

Viewing the complaint and body-camera allegations in the light most favorable to Scollon—as Rule 12 requires—the Deputies:

1. Knew Scollon was unarmed and non-threatening;
2. Said Scollon was going to pay for that, after Scollon went to the Georgia State Patrol.
3. Intentionally escalated by breaking windows rather than using de-escalation;
4. Deployed tasers repeatedly on a seated, contained driver;
5. Continued to tase Scollon after another deputy said "hold taser."

6. Threatened to "light [him] up," showing intent to harm rather than secure compliance;
7. Tased Scollon a second time in direct response to profanity, i.e., as retaliation;
8. Simultaneously yelled "don't fucking move" while yelling to "open the door." Once Scollon reaches for the door, they tase him.
9. Drug him out of the car by his arm and ground his face into the ground after he was incapacitated by the taser;
10. Acted without lawful basis to seize or enter the vehicle when no crime had been committed; and
11. Used force for punitive or retaliatory purposes, not enforcement.

This is not negligence. It is intentional, deliberate wrongdoing.

**B. The District Court Applied an Incorrect, Extra-Stringent Standard and Improperly Resolved Factual Disputes Against Scollon.**

The District Court required Scollon to prove actual malice rather than merely plead it. That is legal error. At the motion-to-dismiss stage, a plaintiff need only allege facts supporting a reasonable inference of deliberate wrongdoing. The Eleventh Circuit is clear: "A jury can infer actual malice based on an officer's conduct." *Felio v. Hyatt*, 639 F. App'x at 611.

The Eleventh Circuit has repeatedly reversed dismissals where district courts improperly resolved factual disputes relating to intent, motive, or mental state. See *Hoyt v. Cooks*, 672 F.3d 972, 981 (11th Cir. 2012) (actual malice may be inferred; a jury should determine intent unless there is no way a reasonable jury could determine the intended wrong). Because actual malice turns on intent, motive, and state of mind, it is almost never appropriate for resolution at the pleading stage—particularly where the conduct was aggressive, violent, and discretionary, as here.

Scollon plausibly alleged that the Deputies acted with actual malice by intentionally engaging in violent, unjustified, and retaliatory conduct. These allegations are more than sufficient to overcome official immunity at the Rule 12(b)(6) stage. The District Court's contrary conclusion rests on factual determinations and inferences improper on a motion to dismiss and inconsistent with Georgia and Eleventh Circuit precedent. Reversal is required.

## IV. THE MONELL CLAIMS AGAINST PICKENS COUNTY AND SHERIFF CRAIG WERE IMPROPERLY DISMISSED.

The district court erroneously dismissed Scollon's Monell claims against Pickens County and Sheriff Craig based on an overly narrow view of municipal policymaking authority and an improper factual determination that no policy or

custom caused the constitutional violations. Scollon adequately alleged a policy, custom and failure to train that caused constitutional violations. At the Rule 12(b)(6) stage, the complaint plausibly alleged (1) the existence of a policy or custom of escalating encounters, using excessive force, failing to intervene, and avoiding medical care for detainees; (2) widespread failures to train and supervise deputies; and (3) deliberate indifference by the Sheriff as final policymaker. These allegations easily satisfy *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and its progeny.

The District Court dismissed Scollon's Monell claim against Pickens County on the ground that the County "does not control" the Sheriff or his deputies and therefore cannot be liable for their conduct. That analysis misapplies Eleventh Circuit precedent and ignores both the function-specific nature of the Manders inquiry and the specific allegations of County–level policy and practice in this case.

A. **Under *Manders*, the Sheriff Acts as a County Policymaker for the Law-Enforcement Functions at Issue Here.**

In Georgia, whether a sheriff acts for the State or the County is a function-specific question, not a categorical rule. *Manders v. Lee*, 338 F.3d 1304, 1308, 1312–19 (11th Cir. 2003) (en banc). *Manders* held that a sheriff acts as an arm of

the State when setting use-of-force policy inside the county jail, because that function is bound up with the State's responsibility for housing state prisoners. *Id.* at 1315–19. *Manders* did not hold that a sheriff always acts for the State in every law-enforcement function.

Here, the relevant conduct did not involve managing state prisoners inside a jail. It involved roadside traffic enforcement, deployment of patrol units, use of force in effecting an arrest on a public roadway, and decisions about transporting an arrestee to jail or the hospital. Those functions, like the Sheriff's road-patrol activities in *Vineyard,* are classic local law-enforcement tasks directed at protecting county residents and enforcing law within county borders, not administering state penal sentences.

Scollon's complaint alleges that the Sheriff's Office coordinated with multiple county agencies—Pickens County Sheriff's Office, Jasper Police Department, and Pickens County 911/Fire & Rescue—to pursue, box in, tase, and arrest him in front of the Georgia State Patrol post, and then to transport him in a county vehicle to the county jail instead of a hospital.

Those allegations describe County-level law enforcement operations, not a State function like operating a prison. Under *Manders*' function-by-function framework, the Sheriff was "wearing a county hat" for these activities.

Because the Sheriff was acting as the final county policymaker for these local law-enforcement functions, his policies, customs, and deliberate indifference are properly attributable to Pickens County under *Monell*.

### B. ***Vineyard*** **Confirms County** ***Monell*** **Liability Where the Sheriff's Training and Discipline Are the Moving Force Behind Excessive Force.**

In *Vineyard v. County of Murray, Georgia*, 990 F.2d 1207 (11th Cir. 1993), the Eleventh Circuit held that a Georgia county could be held liable under *Monell* where the sheriff's inadequate training, supervision, and complaint-handling procedures were the "moving force" behind deputies' use of excessive force. *Id*. at 1212–13. The court affirmed a verdict against the county based on evidence that the sheriff failed to investigate or discipline prior incidents and failed to implement adequate policies, thereby signaling toleration of unconstitutional force. *Id*.

Scollon alleges materially similar policy failures here:

- that Pickens County deputies were not properly trained and supervised regarding (1) taser use, (2) safe removal of a suspect from a vehicle, (3) rendering medical attention, and (4) when to seek hospital care rather than jail intake;

- that Scollon repeatedly sought meetings with Sheriff Craig to complain about prior harassment and use of force by deputies, and those meetings were twice cancelled; and
- that deputies casually referenced a similar "second event in two days" and described this violent incident as "easier," demonstrating an entrenched practice and lack of corrective discipline.

Those facts, taken as true, plausibly show precisely what *Vineyard* found actionable: a policy or custom of inadequate training, supervision, and complaint handling that was the moving force behind the unconstitutional force used against Scollon. Under *Vineyard*, that is enough at the pleadings stage to sustain a Monell claim against the County.

C. **Official-Capacity Claims Against the Sheriff Do Not Erase the County's Monell Exposure.**

The District Court appears to have treated the Sheriff's official-capacity status and the County's lack of formal control over the Sheriff as a categorical bar to Monell liability. That is not the law. Where, as here, the Sheriff is the final policymaker for county law enforcement for the function at issue, his policies and deliberate indifference are county policy for *Monell* purposes. *Vineyard*, 990 F.2d at 1212–13. Nor does the fact that Scollon also sued Sheriff Craig in his official

capacity justify dismissing the Monell claim against the County. Official-capacity claims and Monell claims are often "functionally equivalent," but that equivalence cuts against dismissing the County, not in favor of it. See *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991). At most, the District Court could have streamlined redundant official-capacity parties; it could not, consistent with *Vineyard* and *Manders*, insulate the County itself from Monell liability simply by labeling the Sheriff an "independent constitutional officer" without conducting the required function-specific analysis.

Because Scollon plausibly alleged that Sheriff Craig, acting as Pickens County's final policymaker for local law enforcement, maintained policies and customs of inadequate training, supervision, and complaint handling that were the moving force behind the deputies' use of excessive force and delay of medical care, the district court erred in dismissing his Monell claim against Pickens County at the Rule 12(b)(6) stage.

### D. Even if the Sheriff Is Deemed a State Actor for Some Functions, Pickens County Remains Liable for Its Own Policies; *Grech* Is Read Too Broadly by the District Court.

Even accepting, arguendo, that Sheriff Craig is an arm of the State for some discrete functions, that does not categorically insulate Pickens County from Monell

liability. Under *Grech v. Clayton County*, a county is liable under § 1983 only for acts for which it is "actually responsible"—that is, when the county's own policy or custom causes the constitutional violation. *Grech v. Clayton County*, 335 F.3d 1326 (11th Cir. 2003). *Grech* does not hold that a Georgia county can never be liable when a sheriff is involved; it holds only that Clayton County could not be held liable for the sheriff's state-function of maintaining a warrant database where the plaintiff identified no independent county policy and the sheriff, for that particular function, was not a county policymaker.

Here, by contrast, Scollon's Monell claim is not limited to vicarious liability for the Sheriff's "independent" office. He alleges that Pickens County, through its own policies and customs, coordinated and integrated the actions of multiple county actors—the Sheriff's Office, Jasper Police Department, and Pickens County 911/Fire & Rescue—in a manner that predictably resulted in excessive force and denial of medical care: the decision to box in his vehicle with county units, to authorize taser deployment in that posture, and to transport him to the jail rather than a hospital despite obvious injuries. Those are County-level choices about how its law-enforcement and emergency agencies respond to encounters like this one.

Under *Manders*, whether the Sheriff is a state or county actor turns on the specific function at issue. *Grech* applied that framework to the warrant-

database function; it did not address, let alone immunize, county-wide policies coordinating road patrol, 911 dispatch, and post-arrest transport and medical decision-making. *Grech*'s statement that the county is liable only for what it is "actually responsible" for in fact supports Scollon: his *Monell* theory is precisely that Pickens County is liable only for its own policies—its training (or lack thereof), its failure to discipline, and its coordinated practices with 911 and other county agencies—not merely because Sheriff Craig is a constitutional officer. Moreover, *Vineyard v. County of Murray* confirms that Georgia counties *can* be held liable under *Monell* where the sheriff is the final policymaker for local law-enforcement functions and his failure to train, supervise, or discipline deputies is the moving force behind excessive force. Nothing in *Grech* overruled *Vineyard*'s recognition that, in those circumstances, the sheriff's law-enforcement policies are attributable to the county. Reading *Grech* to categorically bar Monell liability whenever a sheriff is involved would conflict with both *Vineyard* and *Manders*' function-specific approach.

At most, *Grech* limits county liability where the plaintiff identifies no county policy at all and challenges only a sheriff's purely "state" function. That is not this case. Because Scollon has plausibly alleged that Pickens County's own policies and customs regarding training, coordination among county agencies, and

post-arrest medical decisions were the moving force behind the excessive force and denial of medical care he suffered, *Grech* provides no basis to dismiss his Monell claim at the Rule 12(b)(6) stage.

**E. Sheriff Craig Can be Liable for Issuing a Direct Order.**

Further, a sheriff can be held liable for a plaintiff' civil rights claim against him if the actions were affected pursuant to a direct order. *Gardner v. Rogers*, 224 Ga. App. 165, 168 (1996). Plaintiff's Complaint pleads these actions occurred based on an order from Defendant Sheriff Craig. (Doc. 1, ¶75).

**V. GEORGIA'S MOTOR-VEHICLE WAIVER ISSUE SHOULD NOT HAVE BEEN RESOLVED AGAINST PLAINTIFF AT THIS STAGE.**

The district court held as a matter of law that Pickens County did not waive sovereign immunity under Georgia's motor-vehicle waiver statutes. That was premature. At this stage, Scollon need only plausibly allege negligent "use" of a covered motor vehicle that contributed to his injuries. O.C.G.A. §§ 33-24-51(b), 36-92-2.

In *McBrayer v. Scarbrough*, 317 Ga. 387, 893 S.E.2d 660 (2023), the Georgia Supreme Court held that sovereign immunity was waived where deputies allegedly loaded and restrained an arrestee in a patrol car in a way that caused his death, rejecting a narrow reading that limited "use" to driving or collisions. The

Court emphasized that "use" includes how the vehicle is put into service, and that loading, restraining, and transporting a person in a patrol car can constitute negligent "use" under §§ 33-24-51(b) and 36-92-2.

Here, the complaint plausibly alleges at least one instance of negligent vehicle "use" of that kind: after deputies tased Scollon, broke his window, and observed his bleeding head and other injuries, they chose to transport him by patrol car to the jail rather than to a hospital, and the jail then refused to accept him because of his condition. Accepting those allegations as true, a factfinder could conclude that the deputies' use of the patrol car for jail transport, rather than medical transport, contributed to delay and aggravation of his injuries in a way that falls within *McBrayer*'s understanding of "use."

Georgia courts strictly construe waivers of sovereign immunity, but *McBrayer* confirms that "use" is not confined to traffic collisions or the act of driving. At a minimum, the question whether the deputies' transport decision constitutes negligent "use" of a covered motor vehicle is a fact-intensive one that should not have been conclusively resolved against Scollon on a Rule 12(b)(6) motion, particularly without the benefit of targeted amendment in light of *McBrayer*'s clarification of Georgia law. The appropriate course is to vacate the

waiver ruling and remand so that the district court may reconsider the issue, or allow amendment, under the correct, *McBrayer* standard.

## VI. THE DISTRICT COURT ABUSED ITS DISCRETION BY DISMISSING WITH PREJUDICE INSTEAD OF ALLOWING AMENDMENT TO CURE ANY "SHOTGUN" DEFECTS.

This Court reviews the denial of leave to amend, and the choice to dismiss with prejudice, for abuse of discretion. But "[g]enerally, where a more carefully drafted complaint might state a claim, a plaintiff must be given at least one chance to amend the complaint before the district court dismisses the action with prejudice." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (quotation marks omitted). A district court may deny leave to amend only in narrow circumstances—such as undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice, or clear futility. *Id.*; see also *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of those circumstances is present here.

Those principles are even stricter in the specific context the district court invoked "shotgun pleading." This Court has "little tolerance for shotgun pleadings," and it has repeatedly approved striking or dismissing such pleadings. *Weiland v. Palm Beach Cnty. Sheriff's Office*, 792 F.3d 1313, 1320–23 (11th Cir. 2015). But in the "special circumstance of non-merits dismissals on

shotgun pleading grounds," the Court has also "required district courts to sua sponte allow a litigant one chance to remedy such deficiencies" before dismissing with prejudice. *Vibe Micro, Inc. v. Shabanets*, 878 F.3d 1291, 1295 (11th Cir. 2018). In *Vibe Micro*, the Court affirmed dismissal with prejudice only because the district court had already struck an earlier complaint, explained the shotgun problems, and given the plaintiff an opportunity to replead which he then squandered. *Id.* at 1295–96.

Subsequent decisions have reiterated that rule. In *Jackson v. Bank of America, N.A.*, 898 F.3d 1348 (11th Cir. 2018), the Court again emphasized that a district court must give a represented litigant "one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds." *Id.* at 1358 (quotation marks omitted). And in *Barmapov v. Amuial*, the Court described this as "clear" Eleventh Circuit precedent: when a litigant files a shotgun pleading and is represented by counsel, "a district court must sua sponte give him one chance to replead before dismissing his case with prejudice on non-merits shotgun pleading grounds." No. 19-12256, slip op. at 7 (11th Cir. Feb. 3, 2021) (quoting *Vibe Micro*, 878 F.3d at 1296).

Here, the district court repeatedly labeled Appellant's pleading a "shotgun" complaint and faulted the way multiple theories were grouped together. Doc. 20 at

Page 21 at Footnote 21; Page 25 at Footnote 10. Yet it never struck the complaint, never issued a repleader order explaining how to cure the supposed shotgun defects, and never afforded Appellant the one opportunity to amend that *Vibe Micro*, *Jackson*, and *Barmapov* require in this exact context. Nor did the court find bad faith, undue delay, prejudice, or that amendment would be futile under *Bryant* and *Foman*. On Appellant's allegations, a more carefully drafted complaint could easily separate counts, specify which facts support which claims, and clarify any ambiguity the district court identified—precisely the situation in which this Court has held that dismissal with prejudice is an abuse of discretion. *Bryant*, 252 F.3d at 1163.

Because the court short-circuited that well-established process—invoking "shotgun pleading" but then terminating the case at the first pass—its decision to dismiss with prejudice should be vacated and the case remanded with instructions to allow Appellant at least one targeted amendment to cure any pleading-format concerns.

## CONCLUSION

For the reasons set out above, Appellant respectfully requests that this Court:

1. Reverse the dismissal of his federal claims for excessive force, failure to intervene, and deliberate indifference to serious medical needs against the individual deputies, and remand for further proceedings;
2. Vacate the judgment in favor of Pickens County and Sheriff Craig to the extent it rests on an erroneous function-by-function and Monell analysis, and remand for reconsideration under the proper standards;
3. Vacate the dismissal of Appellant's state-law claims based on official and sovereign immunity, including the ruling that Georgia's motor-vehicle waiver does not apply, and remand for further proceedings and, if necessary, targeted amendment in light of McBrayer and related Georgia authority; and
4. In all events, reverse the dismissal with prejudice and remand with instructions that Appellant be afforded at least one opportunity to replead any claims the Court concludes were imperfectly pled but potentially curable by amendment.

Appellant further requests such other and additional relief as this Court deems just and proper.

Respectfully submitted, this 9th day of December, 2025.

**EVANS & WHITE**

*/s/ Amanda Evans*
Amanda Evans
Georgia Bar No. 940328
Amanda@evansandwhite.com
Attorney for Appellant Scollon

643 Atlanta Ave SE
Atlanta, Georgia 30312
(404) 334-5300 (telephone)
(404) 692-7954 (facsimile)

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this document has been prepared with margins according to the rule, one of the font and point selections approved by the Court in Rule 32(g), specifically Times New Roman 14.

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,632 words, excluding the parts of the brief exempted by Rule 32(f).

Respectfully submitted, this 9th day of December, 2025.

**EVANS & WHITE**

*/s/ Amanda Evans*
Amanda Evans
Georgia Bar No. 940328
Amanda@evansandwhite.com
Attorney for Appellant Scollon

643 Atlanta Ave SE
Atlanta, Georgia 30312
(404) 334-5300 (telephone)
(404) 692-7954 (facsimile)

## CERTIFICATE OF SERVICE

This is to certify that I have this day served counsel for all parties who have appeared in this action a copy of the foregoing **APPELLANT'S BRIEF** via e-filing a copy of the same through the Clerk of Court's e-filing system and which will automatically send an email notification of such filing to the following counsel of record as follows:

Phillip Friduss
Jacob Stalvey O'Neal
Hall Booth Smith, P.C.
191 Peachtree Street, NE
Suite 2900
Atlanta, Georgia 30303

This 9th day of December, 2025.

**EVANS & WHITE**

*/s/ Amanda Evans*
Amanda Evans
Georgia Bar No. 940328
Amanda@evansandwhite.com
Attorney for Appellant Scollon

643 Atlanta Ave SE
Atlanta, Georgia 30312
(404) 334-5300 (telephone)
(404) 692-7954 (facsimile)